UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ELLIPSO, INC.                                            )
1133 21st Street, NW                                     )
Washington, D.C.  20036                                  )
                                                         )
MOBILE COMMUNICATIONS HOLDINGS, INC.                     )
1133 21st Street, NW                                     )
Washington, D.C.  20036                                  )
                                                         )
VIRTUAL GEOSATELLITE HOLDING, INC.       CASE NUMBER  1:02CV00433
1133 21st Street, NW
Washington, D.C.  20036                  JUDGE: Thomas Penfield Jackson

                                         DECK TYPE: Contract
VIRTUAL GEOSATELLITE, LLC
1133 21st Street, NW                     DATE STAMP: 03/07/2002
Washington, D.C.  20036

                            Plaintiffs,
                                                         )
v.                                                       )
                                                         )
RICHARD A. INCIARDI                                      )
19800 Helmond Way                                        )
Montgomery Village, MD  20886                            )
                                                         )
                            Defendant.                   )
                                                         )

**FILED**

MAR  7 2002

~~NANCY MAYER WHITTINGTON, CLERK~~
~~U.S. DISTRICT COURT~~

## VERIFIED COMPLAINT

Introduction

    This is an action for preliminary and permanent injunctive relief, as well as monetary

damages, based on breach of a Non-competition and Non-disclosure Agreement, breach of the

duty of loyalty, conversion, tortious interference with contract, and tortious interference with

economic advantage, and violation of the Trade Secrets Act.  Plaintiffs for their Verified

Complaint against Defendant Richard A. Inciardi, a former key employee, state as follows:

## I. PARTIES AND JURISDICTION

    1. Ellipso, Inc.  ("Ellipso")  is a Delaware corporation with its principal place of business

at 1133 21st Street, N.W., Washington, D.C. 20036.

2. Virtual Geosatellite, LLC ("Virtual Geo") is a Delaware limited liability company with its principal place of business at 1133 21st Street, N.W., Washington, D.C. 20036.

3. Mobile Communications Holdings, Inc. ("MCHI") is a Delaware corporation and wholly owned subsidiary of Ellipso.

4. Virtual Geosatellite Holdings, Inc. ("VGHI") is a Delaware corporation and shareholder of Ellipso. VGHI was controlling shareholder of Virtual Geo prior to a stock swap with Ellipso in November 2001, after which Ellipso became the controlling shareholder of Virtual Geo.

5. Inciardi is a former Ellipso employee who, upon information and belief, resides at 19800 Helmond Way, Montgomery Village, Maryland 20886.

6. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1332 and 1367. Damages are far in excess of $75,000. Venue is proper because Plaintiffs all have their principal place of business in the District of Columbia, Inciardi was employed by Ellipso in the District of Columbia, and Inciardi and Ellipso entered into a Non-competition and Non-disclosure Agreement in the District of Columbia, and that Agreement is to be construed in accordance with the laws of the District of Columbia.

## II. FACTS

7. Ellipso and Virtual Geo are affiliated companies. Ellipso owns 75% percent of Virtual Geo. David Castiel, a resident of the District of Columbia, president and chief executive officer of Ellipso, holds controlling ownership interests in both Ellipso and VGHI. The remaining 25% percent of Virtual Geo is owned by Sahagen Satellite Technology Group, LLC, now known as SST Global Technology, LLC.

8. The Plaintiffs have designed and are implementing two patented satellite communications systems. The first is a narrowband mobile satellite system called the "Ellipso

System." The Ellipso System is one of only four mobile satellite systems in the world with a license from the United States Federal Communications Commission ("FCC") to operate on the L-band frequency. Through MCHI, Ellipso filed its license application with the FCC in 1990. Seven years and tens of millions of dollars later, the FCC issued Order and Authorization, 12 FCC Rcd. 9663 (1997), authorizing Ellipso to construct and launch a first-generation constellation of at least sixteen (16) low-earth-orbit satellites and one (1) in-orbit spare satellite. The Ellipso System received yet another FCC license in July 2001 authorizing the Ellipso System to operate on the 2GHz frequency.

9. The second system is a broadband satellite system called the "Virtual Geo System." In March 1995, VGHI filed for a patent to protect aspects of the technology that form the basis of its Virtual Geo System. In late 1998, the first of many patents was issued to VGHI. On January 8, 1999, Virtual Geo submitted a license application to the FCC for authority to launch and operate the Virtual Geo System, a global, fixed-satellite service system employing non-geostationary satellites in sub-geosynchronous elliptical orbits on Ku-band and C-band frequencies.

10. Although the Virtual Geo license application remains pending, the FCC has stated in writing that a license will be issued with the exact terms and conditions to be determined. Using their patented elliptical orbits and designs (additional patents were awarded in the meantime, and others were applied for and are still pending), Plaintiffs intend to provide wireless voice, data, facsimile, paging, geolocation, video, and Internet services to subscribers around the world. The unique elliptical-orbit architectures allow the Plaintiffs to tailor satellite coverage to match population distribution, and/or to "follow" the continents for better market coverage. In addition, Virtual Geo technology allows an unprecedented reuse of spectrum, making a variety of applications possible, including military and broadband video on demand.

11. Because of its reuse potential, there exists an opportunity for Ellipso and Virtual Geo to license their technology to leading aerospace companies, as well as service operators, and

others.

12.  Information related to the Ellipso and Virtual Geo Systems is highly technical,

sensitive, and confidential.  This information, like the Ellipso and Virtual Geo Systems,

themselves, took years to develop and constitutes trade secrets in a highly competitive field.  Any

leakage of the information to Plaintiffs' competitors or potential competitors will cause the

Plaintiffs irreparable harm.

13.  Ellipso and VGHI conceived and developed the Virtual Geo System.  On January 6,

1999, VGHI and Ellipso established Virtual Geo.  Initially, VGHI gained a controlling interest in

Virtual Geo by contributing to it patents and pending patents pertaining to the Virtual Geo

System, and Ellipso received a minority interest by contributing money and other assets.

14.  In late 2001, Ellipso acquired VGHI's interest in Virtual Geo through a stock swap.

The Plaintiffs' relationships with strategic partners, such as The Boeing Company ("Boeing"),

Lockheed Martin Corporation ("Lockheed Martin"), Teledyne Brown Engineering, Inc.

("Teledyne"), Israel Aircraft Industries ("IAI"), EMS Technologies, Arianespace, S.A., Harris

Corporation, and L-3 Communications ("L-3 Com"), and others are crucial to their ability to

successfully complete their satellite systems.  Among other things, these strategic partners

contribute to the design, construction, and implementation of the constituent components of each

satellite system.  For example, Boeing has been under contract to provide the space segment of

the Ellipso System, in collaboration with Harris, L-3 Com, and IAI.  The Plaintiffs also look to

their strategic partners to make financial contributions through vendor and equity financing.

15.  In 1998, Inciardi sought employment with MCHI and its parent, Ellipso.

16.  MCHI offered Inciardi temporary employment for a three-month assignment as

Advisor to the President, Business Development, through the end of 1998.  During this period,

Inciardi was paid $12,000 per month.

17.  On September 22, 1998, Inciardi executed a Non-competition, Non-disclosure

-4-

Agreement with MCHI. The operative portion of the Agreement states:

## 1. COVENANT NOT TO COMPETE

I agree and acknowledge that in order to assure the Company [Ellipso and its affiliated companies] that it will retain its value as a going concern, it is necessary that I undertake not to use my special knowledge of the Company, its business, and my relationships with customers and suppliers to compete with the Company. Therefore, during the term of my employment with the Company and for a period of twelve months thereafter, I shall not, in any location where the Company now conducts or during such period begins conducting any business, except with the Company's express prior written consent, or except in the proper course of my employment with the Company, directly or indirectly, in any capacity, for the benefit of any person:

(a) Solicit, interfere with or divert any person who is or during such period becomes a customer, supplier, employee, salesperson, agent, investor, partner or representative of the Company, in connection with any business which competes with the Company either directly or indirectly.

(b) To the extent that I may be required or expected to use or disclose Confidential Information, establish, engage, own, manage, operate, join, control, or participate in the establishment, ownership, management, operation, or control or be a director, officer, employee, salesperson, agent or representative of, or be a consultant to, any person in any business that competes with the Company.

(c) Solicit, divert or induce any of the Company's employees to leave or to work for any person with which I am connected.

## 2. COVENANT NOT TO DISCLOSE

I further acknowledge that in my employment position with the Company, I occupy a position of trust and confidence with the Company and that prior to the date of this Agreement, and during my employment with the Company, I have and will become familiar with the Company's trade secrets and with other proprietary and confidential information concerning the Company.

At all times during and after the term of my employment with the Company, I shall not, except with the Company's express prior written consent, or except in the proper course of my employment with the Company, directly or indirectly, communicate, disclose or divulge to any person, or use for my own benefit or the benefit of any person, any Confidential Information, as hereinafter defined, no matter when or how acquired, concerning the conduct and details of the operation, technical information, trade secrets, and confidential plans, practices, and information relating to the Company's products, services, marketing, and customers.

18. In Early 1999, Ellipso employed Inciardi at a salary of $108,000 per year, together

with benefits and stock options. He was given the title of Advisor, User Terminals.

19. In April 1999, Inciardi's salary was increased to $120,000 per year when he assumed

-5-

responsibility for managing Plaintiffs' relationship with Boeing and became Vice President for Corporate Business Development. In November, his salary was increased to $144,000 per year when he assumed the additional responsibility of managing Plaintiffs' relationship with Lockheed Martin. Inciardi entered into agreements to reflect his additional compensation, benefits, and participation in Ellipso's Stock Option Plan and agreed therein to abide by the September 22, 1998 Non-Competition, Non-Disclosure Agreement.

20. In his various positions with Plaintiffs, Inciardi was responsible for developing and maintaining relationships with strategic partners and following the design and development of Plaintiffs' systems. These strategic partners and potential strategic partners included: EMS, Boeing, L-3 Com, Lockheed Martin, Teledyne, and SCI.

21. By virtue of his position with Plaintiffs, Inciardi had knowledge of Plaintiffs most sensitive and confidential trade secrets including technical information, business plans, and financial data.

22. On May 22, 2000, Inciardi abruptly resigned from employment with Ellipso, effective June 1, 2000, without any mention of his intention to join a competitor of Plaintiffs. He told Plaintiffs' management that he was "looking at several opportunities."

23. On May 25, 2000, Inciardi became an employee of VGS, Inc. ("VGS"). VGS had just been formed the previous month, on April 14, 2000, by: Peter D. Sahagen, a member of the Board of Managers of Virtual Geo; Thomas Quinn, also a member of the Board of Managers of Virtual Geo; and Neel H. Howard, a former Ellipso officer who resigned from Ellipso the day after VGS was formed.

24. VGS was established for the sole purpose of attempting to take over Virtual Geo and to compete with Plaintiffs. This attempted takeover was declared unlawful and set aside by the Chancery Court in Delaware, whose August 31, 2000 decision was later affirmed by the Delaware Supreme Court. Through Inciardi and others, VGS (reincarnated as Space Resource America or "SRA") continues to attempt to interfere with the Plaintiffs' business relationships

-6-

and to steal the Plaintiffs' Ellipso System, Virgo System, intellectual property, proprietary technology and other assets.

25. After his departure from the Plaintiffs' employment, Inciardi used his relationship with EMS, Boeing, L-3 Com, Lockheed Martin, Teledyne, and SCI, to disparage the Plaintiffs' management, discredit their business potential, question the Plaintiffs' ownership of their technology, and interfere with Plaintiffs' business relations to the advantage of VGS/SRA.

26. On information and belief, through his employment with VGS/SRA, Inciardi has been, and is using the Plaintiffs' confidential information, such as the Plaintiffs' strategic plans for launching the Ellipso and Virgo Systems, as well as the Plaintiffs' relationships with customers, potential investors, and strategic suppliers, for the benefit of himself and VGS/SRA.

27. Before the end of his employment with the Plaintiffs, Inciardi contacted other employees of the Plaintiffs and urged them to leave the Plaintiffs' employ and to join VGS/SRA. The employees solicited by Inciardi were Christopher White, Jay Brosius, and Roger Blott.

28. In his contacts with Brosius and Blott, Inciardi accompanied his solicitations with predictions of the Plaintiffs' financial failure. Neither Brosius nor Blott joined VGS/SRA but were sufficiently concerned by Inciardi's claims that they left the Plaintiffs' employment and limited their availability to consulting work. White joined VGS/SRA.

## III.  CAUSES OF ACTION

29. By having engaged in the foregoing conduct, Inciardi has:

(a)  Breached his contractual obligations owed to Plaintiffs;

(b)  Breached his duty of loyalty;

(c)  Tortiously interfered with Plaintiffs' contractual relationships with third parties and employees;

(d)  Tortiously interfered with Plaintiffs' economic expectancy and advantage;

(d)  Misappropriated and converted Plaintiffs' intellectual property to his own use and

-7-

for the benefit of Plaintiffs' competitors;

(e)  Violated the District of Columbia Uniform Trade Secrets Act, D.C. Code 48-501, et

seq. (2001), which provides, inter alia, for double damages.

## PRAYER FOR RELIEF

Plaintiffs respectfully request the Court to:

A.  Enjoin Inciardi from breaching his contractual obligations with Plaintiffs;

B.  Enjoin Inciardi from using or divulging Plaintiffs' proprietary and confidential

information, trade secrets, and business contacts;

C.  Award Plaintiffs appropriate compensatory and punitive damages;

D.  Award such further relief as may be just and appropriate, including reasonable attorney

fees and costs.

Respectfully submitted,

Martin Lobel  (No. 18960)
Henry M. Banta  (No. 68957)
Arthur L. Fox, II  (No. 58495)

LOBEL, NOVINS & LAMONT
1275 K Street, N.W., Suite 770
Washington, D.C.  20005
(202) 371-6626

Attorneys for Plaintiffs

March 7, 2002